IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARLITE, INC., | ) CASE NO. 5:09CV1401 |
| ) | |
| ) | JUDGE SARA LIOI |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION AND** |
| AMERICA CANAS, ) | **ORDER ON MOTION FOR** |
| ) | **PRELIMINARY INJUNCTION** |
| ) | |
| Defendant. ) | |
| ) | |

Before the Court is plaintiff's motion for preliminary injunction. (Doc. No. 5.) On July 7, 2009, the Court conducted a hearing with both parties in attendance and represented by counsel. The matter is ripe for determination. For the reasons set forth below, the motion is **GRANTED**.

### I. PROCEDURAL BACKGROUND

Asserting diversity jurisdiction, on June 19, 2009, plaintiff Marlite, Inc. ("Marlite") filed its verified complaint (Doc. No. 1, as amended by Doc. No. 30) for damages and injunctive relief against defendant America Canas ("Canas"), a former employee, along with a motion for temporary restraining order (Doc. No. 4) and the instant motion for preliminary injunction (Doc. No. 5).

Marlite alleges in its complaint that Canas, who signed a confidentiality and non-solicitation agreement ("the Agreement") as a condition of her employment with Marlite, is "currently using Marlite's confidential, proprietary, and/or trade secret information for her own

benefit and has solicited Marlite's customers in violation of the express terms of the Agreement." (Compl. ¶ 20.) Marlite alleges misappropriation of trade secrets in violation of the Ohio Uniform Trade Secrets Act (O.R.C. §§ 1333.51, 1333.61, *et seq*.), tortious interference with business relationships, and breach of contract.

Following an *ex parte* conference with plaintiff's counsel on June 19, 2009, the Court issued a Temporary Restraining Order ("TRO") (Doc. No. 8) and scheduled a status conference for June 30, 2009 to discuss expedited discovery concerns and whether to extend the TRO beyond the usual ten (10) days.

Following the June 30th status conference, at which defendant's counsel appeared, the parties agreed to extend the TRO and counsel were to submit a jointly-agreed order for the Court's signature. As it turned out, counsel did not submit an agreed order; rather, plaintiff's counsel filed a motion to extend the TRO until July 7, 2009, the date set for the preliminary injunction hearing. (Doc. No. 16.) The Court granted the motion and issued a modified TRO. (Doc. No. 17.) Marlite now seeks an order as follows:

A. Enjoining Defendant from directly or indirectly interfering or attempting to interfere with a relationship between Marlite and any of its vendors, suppliers, customers or distributors;

B. Enjoining Defendant from directly or indirectly using, permitting the use of, or disclosing to any person, association, firm, corporation, or other entity outside of Marlite any Confidential Information, as that term is defined in the Confidentiality and Non-Solicitation Agreement, which is attached to Marlite's Complaint as Exhibit A, that is not pursuant to defendant's association with Marlite or for Marlite's benefit;

C. Enjoining Defendant from directly or indirectly using, permitting the use of, or disclosing to any person, association, firm, corporation, or other entity outside of Marlite all materials of any nature that belong to Marlite including, but not limited to, documents, files, notes, drawings, specifications, computer programs or software, data samples, schedules or lists of any kind;

>    D.   Enjoining Defendant from using or disclosing Marlite's trade secrets and confidential information; and
>
>    E.   Requiring Defendant and anyone acting in concert or participation with her to return and deliver to Marlite any and all documents whether in written or electronic medium, and any copies, containing, disclosing or describing Confidential Information, upon notice of this Court's Order; and
>
>    F.   Requiring no bond for any such order.

(Motion, Doc. No. 5, at 1-2.) The defendant did not file a brief in opposition to the motion for preliminary injunction.

On July 7, 2009, the Court conducted the preliminary injunction hearing, receiving testimony and evidence. At the close of the hearing, the Court further extended the TRO until July 13, 2009. It also asked the parties to brief the issues of irreparable harm and the applicability of *Professional Investigations & Consulting Agency, Inc. v. Kingsland*, 69 Ohio App. 3d 753, 591 N.E.2d 1265 (Ohio Ct. App. 1990). Both sides timely filed briefs, which the Court has considered. (Plaintiff's brief - Doc. No. 28; Defendant's brief - Doc. No. 27.)

The Court also set a generous briefing schedule on the motion for preliminary injunction, accommodating counsel's scheduling requests. According to that schedule, presuming the motion survived the issues raised in the first round of briefing, the motion would not have been ripe for determination until after August 27, 2009.

Recognizing its need to rule on the motion for preliminary injunction as soon as possible after August 27, 2009, the Court began its own independent research, including studying the realtime transcript of the July 7th hearing. In the course of that research, on July 15, 2009, the Court became convinced that the TRO had already expired and that, under Rule 65, the Court could not further extend it without the consent of the parties. *See, e.g., Hudson v. Barr*, 3 F.3d 970, 974

(6th Cir. 1993) (noting that when a TRO is continued for a substantial length of time, it is effectively converted to a preliminary injunction, which cannot be maintained absent the court's finding of facts and conclusions of law) (citing *Sims v. Greene*, 160 F.2d 512, 517 (3d Cir. 1947)). As a result, the briefing schedule that had been set was no longer feasible. Further, the Court had the opportunity to carefully study the complaint and had serious questions about whether there was subject matter jurisdiction. The Court raised its concerns to counsel in a telephone conference on July 15, 2009.

Counsel agreed that additional briefing on the motion for preliminary injunction was unnecessary, as the Court had before it all the information needed for its own independent analysis and ruling. Counsel were also permitted to brief the issue of subject matter jurisdiction and, having received those briefs (Doc. Nos. 32 and 33) and plaintiff's First Amended Complaint (Doc. No. 30), the Court is satisfied that it does have jurisdiction.

Given the above procedural history, the Court is now prepared to rule on plaintiff's motion for preliminary injunction.

## II. FACTS

Marlite is a commercial and architectural wall system company that has approximately three hundred employees and has been in existence for seventy-five years. Marlite's principal place of business is in Dover, Ohio. Additionally, it has plants in Miami, Florida; Los Angeles, California; Dallas, Texas; Toronto; and Brazil.

Marlite manufactures slatwall and sells it to both distributors and end-users. The slatwall business is price-driven, especially in southern Florida, and the profit margin on this product is generally not high. Yet Marlite enjoys a competitive advantage in the marketplace because of its volume nationwide. As a result, Marlite is able to get board for a lower price. If it

loses volume, its price for raw materials increases, and its profit margin decreases. Loss of Marlite's competitive advantage would particularly impact its Miami facility. As a result, Marlite closely protects its confidential pricing information.

In early 2006, Marlite purchased its Miami facility, a slatwall company named Precision Wood Products. Even though Marlite already had customers in the region, the Miami plant gave Marlite better access to the southeastern United States, and it also gave Marlite the ability to export products to Mexico, Central America, South America, and the Caribbean. Marlite's Miami plant primarily manufactures slatwall. Today, it employs approximately 20-25 people, and its customer base is in Florida, Georgia, North Carolina, South Carolina, Alabama, Mississippi, Louisiana, the Caribbean, Central America, and South America.

When Marlite purchased the assets of Precision Wood Products, it was primarily interested in its customer base; in this respect, Marlite wanted to ensure that it had a "good footing" in the Miami market. Accordingly, Marlite took steps to make sure that the customers (in part, by way of a customer list attached as a schedule to the purchase agreement) were included in the deal. Additionally, the owners of Precision Wood Products were required to sign three (3)-year non-compete agreements, and the three primary owners, Skip Eckenrod, James Robbins, and Jerry David, agreed to a five (5)-year non-compete agreement for their affiliated entities. Of particular importance to this case, at the time of the sale, Skip Eckenrod was affiliated (as owner) with Modular Wood (also a manufacturer of slatwall products).

Canas worked for Precision Wood Products at the time of the purchase. She was hired by Marlite and initially worked as an office employee, office manager, and sales manager.[1]

---

[1] At some point in 2008, Canas was also promoted to the position of international sales manager. However, she wrote a letter to the company indicating that she could not perform the functions of that job, in response to which Marlite accommodated her by permitting her to remain in her prior job.

Eventually, she was given additional responsibilites for the entire facility. As a part of the acquisition process, Marlite required its Miami employees to complete an employment application. The application contained a trade secret and confidentiality provision that provided, in part, as follows:

> If employed by the Company, I agree that I will keep trade secrets and confidential information in the strictest confidence without disclosure to any other person during and after the term of my employment. [. . .]

(Def. Ex. 2.) Canas acknowledged that she read and understood the agreement before she signed it.

Additionally, certain employees with sales responsibilities, such as Canas, were required to enter into a confidentiality and non-solicitation agreement. Thus, on September 27, 2006, in consideration for value given, Canas entered into a Confidentiality and Non-Solicitation Agreement (the "Agreement") with Marlite. In the Agreement, Canas agreed to hold the following categories of confidential information in strict confidence:

(i) The Company's activities, services, products, formulas, computer programs and systems, trade secrets, manufacturing methods, compositions, inventions, discoveries, customer records, processes, information relating to research, development, inventions, work performed or to be performed for Customers, lists of employees and salary information, bidding and quoting procedures, pricing information, mark-up information, financial or sales records or data, marketing plans, strategies, and forecasts;

(ii) Customers' activities, plans, products, processes and services including, without limitation, information relating to business operations, employee relations, finance, and product or service marketing;

(iii) Vendors' activities, plans, services, products and processes including, without limitation, information relating to business operations, employee relations, finance, and product or service marketing; and,

(iv) All information which Employee has a reasonable basis to know was created, modified or used and held secret by the Company or that was accepted by the Company from any third party under an obligation of confidentiality.

6

(Pl. Ex. 10.) As used in the Agreement, the term "customer" meant "any person or entity for whom [Marlite] provided services or products within twelve (12) months prior to the Employee's termination of employment." (*Id.*)

The Agreement further provided that she would not, "at any time," "use, reproduce, distribute, disclose, or otherwise disseminate" the confidential information for the benefit of anyone other than Marlite. Canas admitted that she understood what she was signing and that she never asked any questions before she signed.

Canas also agreed that, for a period of one (1) year after the termination of her employment "for any reason," she would "not, either directly or indirectly solicit, divert or take away, or attempt to solicit, divert or take away" any of Marlite's customers or accounts, or any prospective customers identified or targeted by Marlite while she was an employee. (Pl. Ex. 10, ¶ 2.) The Agreement further provided that, if an employee violated the non-solicitation covenant, "the term of such violated covenant shall be tolled for the period of such violation." (*Id.*, ¶ 5.)

Confidential information and trade secrets are discussed in Marlite's annual HR training sessions. To ensure that employees are trained as to confidential information and trade secrets, Marlite has an internal tracking system that verifies whether employees have received the training. The tracking system indicates that Canas received it.

Canas admitted that, in signing the various employment agreements, she had made a commitment to keep Marlite's proprietary information confidential. In this respect, she understood that information regarding product pricing, raw material costs, labor costs, and other similar information was to be kept confidential and was not to be shared with competitors. She also understood that she was prohibited from contacting or soliciting any Marlite customers for one year after her employment with Marlite ended.

While employed at Marlite, Canas had access to its computer system, which contained a wealth of information regarding Marlite's customers, including their phone numbers, purchasing histories, credit information, contact person, and prices. The system was also used to enter orders and to keep track of inventory. Access was limited and password-protected to prevent unauthorized use. Each employee had a different level of access; Canas had top-level access.

Employees with access to Marlite's computer system were required to sign a computer use policy, which was attached to the employee handbook. The computer use policy prohibited users from disseminating Marlite's proprietary information.[2] Under the policy, confidential information included customer information, prospective lists, and other information for Marlite's actual or potential customers. Marlite's internal tracking system verifies that Canas acknowledged receiving the policy and agreed to abide by its terms.

Canas also had access to a blue binder notebook that was kept in the office at the Miami facility. The blue notebook contained customer information, including pricing, revisions, distribution and export account information. Access to the notebook was limited to certain employees. When Canas left Marlite's employment, she had the notebook at home. She never returned it to Marlite.

As a key employee in Marlite's operation, Canas was privy to highly confidential pricing information, including prices charged to specific customers. She also knew the cost of raw materials and labor, as well as Marlite's profit margin. She was aware of how far she could lower a customer's price without eliminating the profit margin. In fact, Canas knew the formula Marlite

---

[2] In addition to other information, the customer list acquired from the purchase of Precision Wood Products was password specific so that only certain employees had access to it.

used to calculate its profit margin, and she had the authority to lower prices for individual customers by using that formula.

In January 2009, Marlite decided to eliminate ten percent of its salaried employees because of current economic conditions. Canas's position was one of those eliminated. On January 14, 2009, John Popa ("Popa"), Marlite's President and CEO, and Rick Miller ("Miller"), its Vice President of Human Resources, met with Canas and informed her that her position was being eliminated. Because Canas was well-liked, and because they wanted her to remain a Marlite employee, Popa offered her a sales position selling slatwall and all other Marlite products nationwide. The new position was for a reduced salary ($30,000, plus commissions, versus the $60-65,000 straight salary she was making at the time), but it had the potential of allowing her to make more money than she was making on a straight salary. Alternatively, in the event that she did not wish to take the new position, she was offered a written severance agreement that would have paid her two months' salary.

Canas did not sign or accept the severance agreement; instead, she accepted the new position. Because the situation was traumatic, Canas was given the afternoon off so that she could go home and think about what she needed to get started in the new position.

To be fair to Canas, because the position offered was new to both her and the company, and further because they wanted her to be successful, Popa informed Canas that she would receive her pre-January 14th salary until her new responsibilities were defined. Over the next few months, Canas and Marlite attempted to work out a job description for her new position. Canas participated and provided feedback regarding the responsibilities of the new position, and some of her requests were incorporated into drafts.

Additionally, because Canas was now "the key person on Marlite's sales team," she was invited to attend a summit in February 2009 with Marlite executives. Popa, who attended the summit, had determined that targeting the company's slatwall product line would be the way to get Marlite through the current national recession. At the summit, the participants took an extensive look at the industry and did a self-critical analysis of Marlite's strengths and weaknesses. It was a "major strategy session" during which there was discussion regarding a multitude of topics, including current economic conditions in the slatwall industry, market shares, market opportunities, cost information, competitors, and selling strategies. Also, major customers were identified, the sales history of customers was reviewed, and the manufacturing capabilities of each of Marlite's facilities was evaluated. Essentially, every possible marketing strategy was discussed and shared with Canas because she was going to be the person making most of the phone calls and having email contact with the targeted customers.

In May of 2009, Marlite sent Miller to talk to Canas about her performance (which was not what Marlite thought it should be) and Canas's unwillingness to agree on a job description or to sign the new employment contract (which, in addition to a confidentiality and non-solicitation provisions, also contained a non-competition covenant due to Canas's new nationwide responsibilities and her new access to all Marlite products).

As it turns out, sometime in the spring of 2009, Canas had received a call from Skip Eckenrod's wife asking if she would be interested in working for Marlite's competitor Modular Wood, which was owned by Eckenrod.[3] She then met with Eckenrod, who also asked her to work

---

[3] Popa testified that, after he purchased Precision Wood, he and Eckenrod also had conversations about Marlite purchasing Modular Wood. Those conversations broke off in April or May of 2009, and Modular Wood then began to compete with Marlite in Florida. (Prior to that, there had been little or no competition presumably because of the non-compete agreements signed in connection with the Precision Wood deal.) According to Popa, Eckenrod told him that he would put Marlite out of business if Marlite did not purchase Modular Wood.

for his company. Canas, went on vacation on April 27, 2009, and when she came back on May 4, 2009, she announced at her meeting with Miller that she was resigning from Marlite.

Canas started working for Modular Wood on May 18, 2009. Shortly thereafter, Marlite received information from customers that Modular Wood, through Canas, was communicating with them. The customers were demanding lower prices from Marlite. Additionally, Modular Wood was contacting Marlite for credit references for Marlite's customers. In response, Marlite has had to reduce its prices, and in some cases, very significantly.

Canas has admitted that, since January 2009, she has contacted on behalf of Modular Wood thirty-nine (39) Marlite customers, all of which were doing business with Marlite when Canas resigned. Additionally, Marlite has received copies of emails that Canas sent to and received from those customers, and it also received messages from customers indicating that Canas had contacted them and had undercut Marlite's prices to obtain orders for Modular Wood. Canas's activity has caused Marlite to lose orders, and it has forced Marlite to lower its prices repeatedly to stem the loss of business. As a result, the Miami facility is now in danger of closing altogether.

### III. STANDARD OF REVIEW

"A preliminary injunction is a remedy used by the court to preserve the status between the parties pending a trial on the merits." *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1002 (S.D. Ohio 2008) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

In considering preliminary injunctive relief, the district court must weigh the following four factors:

(1) the plaintiff's likelihood of success on the merits;

(2) whether the plaintiff will suffer irreparable harm without the injunction;

(3) whether granting the injunction will cause substantial harm to others; and

11

(4)  the impact of the injunction on the public interest.

*Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). No single factor is determinative. Rather, the Court must balance the factors to determine whether they weigh in favor of granting the injunction. *Id*. The party seeking the injunction must establish its case by clear and convincing evidence. *Honeywell, Inc. v. Brewer-Garrett Co.*, No. 97-3673, 1998 WL 152951, at *3 (6th Cir. Mar. 23, 1998) (citing *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968); *Vanguard Transp., Sys., Inc. v. Edwards Transfer & Storage Co.*, 109 Ohio App. 3d 786, 673 N.E.2d 182, 186 (Ohio Ct. App. 1996)).

"Ohio courts have long held that a preliminary injunction may be issued to enforce a covenant not-to-compete where the agreement to be enforced is valid, the agreement's restrictions are reasonable, and the party seeking the injunctive relief has demonstrated irreparable harm." *Prosonic*, 539 F. Supp. 2d at 1002-03.

## IV.  LAW AND ANALYSIS

**A.  Success on the Merits**

Marlite alleges that Canas has misappropriated its trade secrets and confidential information, has tortiously interfered with it business relationships, and has breached the Confidentiality and Non-Solicitation Agreement ("the Agreement"), which she signed as a condition of her employment with Marlite.

In opposition, defendant raised the following arguments: (1) the [preliminary injunction][4] is not necessary for the protection of Marlite; (2) the [preliminary injunction] is overly burdensome to Canas; (3) the [preliminary injunction] is contrary to the public interest in legitimate

---

[4] Canas never filed any opposition to the motion for preliminary injunction. However, her arguments are contained in her July 13, 2009 brief opposing the extension of the TRO (Doc. No. 27) and are, presumably, equally applicable to the motion for preliminary injunction.

price competition; (4) the harm complained of by Marlite is strictly financial and can be measured in monetary damages; (5) the customer list, which is the primary subject of the [preliminary injunction], is already in the hands of a competitor through no fault of Canas; (6) the price Marlite charges for slatwall is openly provided to Marlite's competitors by Marlite customers; (7) the covenant Marlite seeks to enforce is overbroad and contains no easily modifiable temporal or geographic restrictions; (8) in order to comply with the rule of reasonableness, the Marlite covenant will need to be virtually rewritten; and (9) Marlite has failed to meet its burden of proof.

### 1. Misappropriation of Trade Secrets

The Ohio Supreme Court looks to the following factors in determining whether an employee possesses a trade secret:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 399-400 (2000). Beyond establishing that the defendant possessed trade secrets, the plaintiff bears the additional burden of demonstrating that misappropriation has occurred or is threatened. *See Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1042-43 (N.D. Ohio 2003). Proof by clear and convincing evidence is required to justify relief in trade secrets cases under O.R.C. § 1333.62. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 268 (Ohio Ct. App. 2000)

### 2. Tortious Interference with Business Relationships

To recover on a claim of tortious interference with business relationships, a plaintiff must show: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the

relationship; and (4) damages resulting therefrom. *Shah v. Cardiology South, Inc.*, 2005 WL 120062, *9, 2005 Ohio App. Lexis 195, at *25 (Montgomery Jan. 21, 2005) (citing *Wolf v. McCullough–Hyde Memorial Hosp., Inc.*, 67 Ohio App. 3d 349, 355, 586 N.E.2d 1204 (1990)). Fair competition, however, is privileged and will defeat a claim of tortious interference with an at-will employment contract. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 707 N.E.2d 853 (1999). To determine whether defendant's conduct is improper or privileged, Ohio courts look to the nature of the actor's conduct, motive, interests interfered with, interests of the actor, societal interests, remoteness of the interference, and the relationship of the parties. *Dryden v. Cincinnati Bell Tel.*, 135 Ohio App. 3d 394, 734 N.E.2d 409, 414 (1st Dist.1999) (citing RESTATEMENT OF THE LAW (SECOND), TORTS § 767).

*Prosonic*, 539 F. Supp. 2d at 1006.

### 3. Breach of Non-Solicitation Agreement

Ohio courts will generally uphold covenants such as those in the Agreement if they are reasonable. "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such results." *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 26 (1975). "A covenant not to compete, like any other contract which is reasonable and was entered into knowingly and voluntarily by an employee with his employer, is enforceable absent vitiating circumstances surrounding its execution, such as proof of the contract defenses of fraud, mutual mistake of fact, or lack of consideration." *Credit Consultants, Inc. v. Gallagher*, No. 91AP-26, 1991 WL 124357, at *3 (Ohio Ct. App. June 25, 1991) (citing *Raimonde*).

If the Agreement were enforceable based on its terms, Canas could limit (but not escape) its reach if there was a lapse in her employment with Marlite. She argues that her employment was terminated and that she was rehired, but that, since she never signed a new

Agreement to cover her new position (which she resigned on May 4, 2009), the covenants in the Agreement began to run on January 14, 2009. To prevail, Canas must be able to show "'a clear and complete severance of the relationship of employer and employee or, in other words, the end of the status.'" *Mullins v. Prudential Ins. Co.*, 6 Ohio St. 2d 148, 150 (1966) (quoting 68 A.L.R. 2d 36).

### 4. Analysis of Success on the Merits

Based upon the factual findings in Section II, *supra*, the Court concludes that plaintiff is likely to succeed on the merits of its claims. Canas clearly possessed Marlite's trade secrets and confidential information (relating to pricing, cost of raw materials, profit margin, customer identities[5] and purchasing histories, and the like). She knew that the information, available to a limited number of employees through password-protected databases, was proprietary in nature. She was also perfectly aware that she had signed a non-solicitation agreement, which the Court concludes was still in force when Canas left Marlite in May of 2009. In breach of the non-solicitation agreement, defendant knowingly used the proprietary information she possessed to tortiously interfere with Marlite's business relationships by soliciting Marlite's customers with whom she had done business as a Marlite employee.[6]

With respect to the element of success on the merits, the balance weighs in plaintiff's favor.

---

[5] Defendant attempted to make the point that many of the customers with whom Canas was dealing were known to her before she worked for Marlite and were known to Modular Wood before she began to work for them, and that, therefore, the non-solicitation provision should not be enforced against her. That argument, however, misses the point. Canas signed the Agreement and agreed to be bound by it. More importantly, it is her intimate knowledge of Marlite's pricing scheme that makes her contact with Marlite's customers on behalf of Modular Wood particularly unfair competition.

[6] Contrary to defendant's position that her employment had been terminated in January 2009, the facts of record show that she retained her employment, although in a different capacity. She did not suffer any loss of benefits and, initially, she was even paid her same salary while they worked out the details of her new position.

### B.       Irreparable Harm

"[A] plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott*, 973 F.3d 507, 511 (6th Cir. 1992). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate[,]" *id.* (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)), and "where the potential economic loss is so great as to threaten the existence of the movant's business[,]" the general rule of monetary damages does not apply. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995).

"Under Ohio law, even the threat of harm is sufficient basis on which a court may grant injunctive relief." *Jacono v. Invacare Corp.*, No. 86605, 2006 WL 832451, at *7 (Ohio Ct. App. March 30, 2006) (citing *Procter & Gamble*, 140 Ohio App. 3d at 274); *see also Prosonic*, 539 F. Supp. 2d at 1007 (quoting *Jacono* for the proposition that substantial threat of harm exists where a defendant employee "possesses knowledge of the employer's trade secrets and begins working in a position that causes her to compete directly with the former employer or the product line that the employee formerly supported.").

Based on the facts set forth in Section II, *supra*, the Court concludes that Marlite will suffer irreparable harm if Canas is not preliminarily enjoined. It is clear that, as a result of Canas's competing activities on behalf of her new employer, Marlite has been forced to lower its prices significantly to keep customers that have been solicited by Canas. If that is allowed to continue, it is likely, if not certain, that Marlite will eventually reach a point where its price does not cover its costs. As a result, Marlite would not enjoy any profits. Although some of that loss *might* be remedied by way of damages, the record also shows that Marlite's economic loss would almost certainly be so great as to require the closure of its Miami plant. That sort of harm is irreparable.

Therefore, with respect to the element of irreparable harm, the balance weighs in plaintiff's favor.

### C. Substantial Harm to Others

"In assessing a motion for a preliminary injunction, this Court must consider whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction." *Extracorporeal Alliance*, 285 F. Supp. 2d at 1045 (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). "Where harm to others exists from an injunction, the party seeking the injunction must make an even stronger showing on the other factors to justify its issuance." *Id.* (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985)).

The record contains no facts that would support a conclusion that others, including Canas, would be harmed by a preliminary injunction requiring her to abide by the confidentiality and non-solicitation agreement. Therefore, the Court cannot conclude that harm to others would outweigh the irreparable harm to Marlite.

This element, therefore, also weighs in plaintiff's favor.

### D. The Public Interest

Finally, the Court must assess whether an injunction will serve the public interest. "[U]pholding reasonable contracts is generally in the public interest." *Prosonic*, 539 F. Supp. 2d at 1008 (citing *Ratchford v. Proprietors' Ins.*, 47 Ohio St. 3d 1, 8 (1989) ("persons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced.")).

17

The Court concludes that the public interest would be furthered by requiring Canas to abide by the confidentiality and non-solicitation agreement that she knowingly entered into and, arguably, knowingly breached.

On this element, the balance weighs in plaintiff's favor.

## V. CONCLUSION

For the reasons set forth above, the Court concludes that Marlite has met its burden of proving that it is entitled to a preliminary injunction against defendant. Accordingly, the motion for preliminary injunction (Doc. No. 5) is **GRANTED**. Commencing on July 14, 2009 and continuing for a period of one (1) year (pursuant to paragraphs 2 and 5 of the Agreement) defendant America Canas is enjoined as set forth in the following section.

## VI. PRELIMINARY INJUNCTION

A. Canas is enjoined from directly or indirectly interfering or attempting to interfere with a relationship between Marlite and any of its vendors, suppliers, customers or distributors in the region including Florida, Georgia, North Carolina, South Carolina, Alabama, Mississippi, Louisiana, the Caribbean, Mexixo, Central America and South America;

B. Canas is enjoined from directly or indirectly contacting or soliciting any prospective customer of Marlite in the region including Florida, Georgia, North Carolina, South Carolina, Alabama, Mississippi, Louisiana, the Caribbean, Mexixo, Central America and South America;

C. Canas is enjoined from directly or indirectly using, permitting the use of, or disclosing to any person, association, firm, corporation, or other entity outside of Marlite any confidential information, defined as follows:

   (i) Marlite's activities, services, products, formulas, computer programs and systems, trade secrets, manufacturing methods, compositions, inventions, discoveries, customer records, processes, information relating to research, development, inventions, work performed or to

        be performed for customers, lists of employees and salary information, bidding and quoting procedures, pricing information, mark-up information, financial or sales records or data, marketing plans, strategies, and forecasts;

    (ii)    Marlite's customers' activities, plans, products, processes and services including, without limitation, information relating to business operations, employee relations, finance, and product or service marketing;

    (iii)    Marlite's vendors' activities, plans, services, products and processes including, without limitation, information relating to business operations, employee relations, finance, and product or service marketing; and,

    (iv)    All information which Canas has a reasonable basis to know was created, modified or used and held secret by Marlite or that was accepted by Marlite from any third party under an obligation of confidentiality;

D.    Canas is enjoined from directly or indirectly using, permitting the use of, or disclosing to any person, association, firm, corporation, or other entity outside of Marlite all materials of any nature that belong to Marlite including, but not limited to, documents, files, notes, drawings, specifications, computer programs or software, data samples, schedules or lists of any kind;

E.    Canas is enjoined from using or disclosing Marlite's trade secrets and confidential information; and

F.    Canas and anyone acting in concert or participation with her is required to return and deliver to Marlite any and all documents whether in written or electronic medium, and any copies, containing, disclosing or describing Confidential Information, upon notice of this Court's Order.

For purposes of this injunction, "customer" is defined as any person or entity for whom Marlite provided services or products within twelve (12) months prior to Canas's termination of employment on May 4, 2009. The term "prospective customer" is defined as any customer who was targeted by Marlite during and as a result of its February 2009 summit meeting in Florida.

Additionally, "vendor" means any third party selling or licensing a product or service to a customer or to Marlite within twelve (12) months prior to Canas's termination of employment.

Finally, Marlite is not required to post bond, Canas having waived the requirement as part of the Agreement. (*See* Pl. Ex. 10, ¶ 6.)

**IT IS SO ORDERED**.

Dated: July 22, 2009

                                              **HONORABLE SARA LIOI**
                                              **UNITED STATES DISTRICT JUDGE**